OPINION
Bradley Twyman appeals from his conviction in the Kettering Municipal Court of Resisting Arrest in violation of R.C. 2921.33.
The facts underlying this appeal are not seriously in dispute, their legal implications are. On November 1, 2000 Twyman was shopping at the Town and Country Shopping Center in Kettering. Patrolman Glen Evans of the Kettering Police Department was dispatched to the shopping mall to meet Security Officer Cremeans. Cremeans pointed out Twyman who was there shopping at the NRA Music Store in the mall as a suspect in a criminal damaging which had occurred at the Fine Arts Gallery in the mall four days earlier. Twyman was standing at a rack looking at CD's and there were about seven customers in the music store.
Officer Evans said he wanted to talk to Twyman about the criminal damaging complaint and at the direction of the security personnel "I was asked to trespass him from the property." (Tr. 8). Evans then testified as follows:
"BRASIER: Objection, hearsay.
"A. . . . find out what happened. . . .
"NEWBERRY: Hold on a second, it's preliminary.
"COURT: Overruled.
"NEWBERRY: Go ahead.
 "A. . . . find out what happened and then we would like to trespass him from the store. They said that they had prior problems. I approached him and I identified myself and said `Hi, I'm Officer Evans with Kettering Police Department and I would like to talk to you a minute' and he immediately began yelling at me and said `I don't have to talk to you, I'm not talking to you, leave me alone.' I said `Sir you don't understand,' I said I'm a police officer I'm here investigating a crime,' and I said `I needed to talk to you,' `I haven't done anything, leave me alone.' So at that point I asked him to lower his voice a little bit, I asked him to calm down, and I basically explained to him that what I wanted to do was identify him so I could put his information down in my report since it had occurred on a Saturday night. And then make a trespass from the property. He attempted to turn around and walk away from me uh I placed my hand on his shoulder. I asked I said `Sir please don't walk away from me.' I said, `I'm conducting a criminal investigation.' I said, `I need you to cooperate with me.' At that point he said `Fuck you I'm not talking to you' he turned around walked toward the clerk and uh told her to tell me that he didn't have to talk to me. The clerk was attempting to cash out a purchase there, there's a customer standing at the desk. I again asked him `Please sir just cooperate all I need to do is identify you,' I said `please don't walk away from me again uh we need to get this taken care of.' At that point he attempted to walk away. I placed my hand on his arm to hold on to his arm, he turned around on me and entered within probably six [6] inches, pretty much nose to nose looked me right in the eye and said `I don't have to talk to you, I'm not talking to you, get your hands off me.' And at that point I was fearful, I thought he was probably going to assault me. Just because of his agitated state. Uh . . .
"Q. Was he using any profanity while he talked?
"A. Uh it was yeah at some point he was using profanity.
"Q. What was the predominate word in his . . .
 "COURT: Let's hold on a second here, I'm at the testimony, no I need Frank
. . . Hold on just a second. You may proceed.
 "Q. What was the predominate word in his exclamation said in the store?
 "A. The basic word was `fuck you' or `fuck I don't have to talk to you.'
"Q. Did he say that more than once.
"A. Several times.
 "Q. And what tone and volume of voice did he say, `fuck you, fuck this'?
 "A. Extremely loud, he was screaming, uh he was highly agitated.
"Q. Were there other people in the store?
"A. Yes.
 "Q. Did they appear to react to his yelling and screaming?
"A. Yes.
 "Q. In general did they appear to react to his yelling and screaming of that magic word?
"A. Uh yes. All the attention was on us at that point.
 "Q. This is the store that's open for business that has customers in it?
"A. Correct.
"Q. Okay. Then what happened?
 "A. At that point I called, there's another officer arriving, Officer Ferrell. I called for him to come immediately because I thought we were going to have a problem there. He came in; he started trying to calm him down. We are both exhorting him just to calm down so we can get this taken care of. I did make a threat of arrest at that point for the obstruction and he said, `fuck you, you're not arresting me.' He continued to talk to the clerk trying to convince her to tell me that he didn't have to her [sic]. He bumped into a customer I basically shielded the customer. I got between the customer and him, pushed her back and advised him at that point he was under arrest. At that he began actively resisting I did an arm bar take down and swept his feet out from under him and he went down onto his stomach. He immediately tried to get up. Officer Ferrell and I were wrestling with him, he had some bags in his hands but we were trying to get his arms behind his back. We had great difficulty doing that; he was showing a great amount of strength. Um that was alarming and uh I was able to get one handcuff on, I believe it was his left arm. I attempted to pull his arm behind his back, but I was unable to do so. Um, Officer Ferrell jumped on his back attempting to pin his shoulders to the ground; I was attempting to immobilize his head so that he couldn't make any further movements up off the ground. Um Officer Ferrell and I continued to tell him quit fighting and resisting, just, I don't even know what the time frame was but it went on for a long time. Um . . .
 "Q. Could you give me an estimate on how long you were rolling on the floor?
 "A. I'm thinking probably two [2] to three [3] minutes it took a long time to get the handcuffs on him.
 "Q. And was he resisting physically and violently that whole time?
 "A. He was resisting physically; violently he knocked over a couple of racks containing some CD's. Uh, Officer Ferrell and I continued to attempt to take him into custody. He wasn't feeling any pain we attempted to do joint manipulation and pressure point techniques. He was not responding to the pain that those are suppose to cause. He continued to fight, I was getting tired and Officer Ferrell was getting tired. So I increased my use of force and uh did what we call brachial plexus stun, which is basically I did a palm field strike to his brachial plexus area. And what it is suppose to do is cause a disruption and stun him for a couple of seconds to allow us to get the handcuffs on. I performed the maneuver uh he smacked his head on the pavement came back up continued fighting.
"Q. You mean you struck him in the side of the head . . .
"A. In the plexus, right here (pointing to his head) . . .
"Q. Okay.
"A. . . . right on the side.
"Q. Did it have . . .
"A. No.
 "Q. . . . did it have the effect you've been taught in training?
"A. No.
"Q. Okay.
 "A. And uh part of that was and I didn't mean for it to happen, but his head smacked off the carpeting, which was a concrete floor underneath there. That in fact didn't have any effect and he continued to fight. Um finally Officer Ferrell was able to get control of his right arm and I got control of his left arm and we had two [2] pair of handcuffs that we had to get together, which we only use reserve that for overweight people because we couldn't generate enough strength to get his arms behind him. When we got him off the ground I reiterated you're under arrest. I asked him again to quit fighting, he continued to fight, kick, scream, yell "fuck you" several times. We advised him that we're going to take you out to the cruiser, we're going to place you in the cruiser and we're going to take you to the police department. When we got out to the car he refused to get in the back of the car, which forced me to go around to the other side, grab him by the shoulders and then pull him in. Um at that point we transported him to the police department with the assistance of the jailers we got him to the jail and uh at that point they attempted tried to get information from him.
"Q. Were you injured?
 "A. I strained my right shoulder and some abrasions on my knees.
 "Q. And the person you had this you had to fight with like this for two [2] or three [3] minutes is this Defendant over here?
"A. Yes it is.
"Q. The fellow right here?
"A. Yes."
Officer Evans stated he felt he had a basis to arrest Twyman for disorderly conduct but chose to arrest him for obstructing official business because he refused to cooperate with his investigation. (Tr. 24, 25). Evans said Twyman's conduct appeared to frighten other people in the music store. (Tr. 38, 39).
The defense presented no witnesses and the trial court denied a defense motion for an acquittal. The trial court found Twyman guilty of resisting arrest after the court concluded that Officer Evans had probable cause to believe that Twyman had committed the offenses of disorderly conduct and obstructing official business. The trial court sentenced Twyman to 180 days in jail, the maximum penalty for a first degree misdemeanor. The court suspended 165 of the sentence and placed Twyman on probation for a two year period. The sentence imposed was stayed pending resolution of this appeal.
In his first assignment, Twyman contends he was denied due process when the State provided him a defective bill of particulars.
In response to a motion for a bill of particulars the State responded with the following bill:
 "Now comes the prosecution pursuant to defendant's request for a bill of particulars, and says:
 "That on or about November 12, 2000, in the City of Kettering, Montgomery County, Ohio, at the Town 
Country Shopping Center, Bradley Twyman did commit the offenses of Disorderly Conduct by causing inconvenience, annoyance and alarm to others by committing the following acts: while in the Fine Arts Gallery/Library of Design at Town Country Shopping Center, he was screaming, `Fuck! Fuck you!'; by taking a piece of art from the wall of the Fine Arts Gallery and throwing it to the floor and yelling and screaming in an incoherent manner, despite requests to desist; and
 "That defendant committed the offense of Resisting Arrest by screaming, yelling, thrashing about, bumping into unidentified customers in the Fine Arts Gallery, flailing his arms about, refusing to be handcuffed, continually trying to escape from the grasp of Kettering Police Officers Ferrell and Evans, pushing himself up from the ground, continuing this behavior for 2-3 minutes, refusing to enter the patrol car after finally being subdued and handcuffed, screaming, `Fuck you. You're not going to arrest me! Let me go now! Fuck you, fuck you, you're not going to arrest me!', refusing to walk to the cruiser after being handcuffed, hooking his leg around a security device to keep the police from dragging him out of the store, defendant yelling, `I am not trespassing!'; and
 "That defendant committed the offense of Trespassing by refusing to leave a retail establishment, `Presentations,' located in the Town Country Shopping Center, after being asked/told to leave by the agent of the owner, Mary Zitiello."
The State provided the wrong date and the wrong location for the charged offenses. Later after Twyman filed a notice of alibi to the November 12th date, the State amended the bill to reflect the correct date of the offenses. It did not amend the location previously stated in the bill.
Twyman claims the inaccurate description of the location of the crime prevented him from filing a suppression motion and adequately preparing for trial. The State did not respond in its brief to this assignment.
The purpose for giving bill of particulars is "to elucidate or particularize the conduct of the accused," but not to provide the accused with specifications of evidence or to serve as a substitute for discovery. State v. Sellards (1985), 17 Ohio St.3d 169.
We do not see how Twyman was prejudiced by the State's inaccurate location of the offenses. There can be little doubt that Twyman knew where he was arrested and where he was alleged to have resisted arrest. We do not know what evidence could have been suppressed if more accurate information were provided. Basically, Twyman wanted to know what conduct of his constituted the charges of obstruction of official business and resisting arrest. The obstruction of official business was dismissed. The bill specified in detail the conduct of the defendant which constituted the resisting charge. The appellant's first assignment of error is overruled.
In his second assignment of error, Twyman argues that the trial court's judgment was against the manifest weight of the evidence because the State failed to present evidence that his arrest was lawful. Twyman argues that he had a right not to answer Officer's Evans inquiries and therefore he could not have been arrested for obstructing official business.
Assuming that Twyman is correct in that contention, he was not free to engage in disorderly conduct by shouting obscenities in a retail establishment in the presence of customers. Although Officer Evans did not arrest Twyman for disorderly conduct, it would have been objectively reasonable for him to have done so, and the trial court so found. R.C.2917.11(A)(2) provides that no person shall recklessly cause inconvenience, annoyance or alarm to another by making unreasonable noise or an offensively course utterance, gesture, or display, or communicating unwarranted and grossly abusive language to any person. See City ofFairborn v. Grills (June 8, 1994), Greene App. No. 92-CA-92, 1994 WL 247122. There was certainly evidence in the record to support Twyman's conviction for resisting arrest if the trial court chose to believe the police officer's testimony which it did. The second assignment is likewise overruled.
In his third assignment, Twyman argues that the trial court erred in sentencing him to 180 days when he was charged with a second degree misdemeanor. Twyman was charged with a violation of R.C. 2921.33(A), a second degree misdemeanor. The trial court apparently amended the charge to a violation of R.C. 2921.33(B) to conform to the evidence that Officer Evans had strained his shoulder and suffered abrasions to his knees in arresting Twyman.
Crim.R. 7(D) provides:
 "(D) Amendment of indictment, information, or complaint. The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." (Emphasis ours).
We find that the amendment by the court clearly changed the identity of the crime charged to a more serious one involving the additional element of physical harm to a law enforcement officer. R.C. 2921.33(B) is not a lesser included offense of R.C. 2921.33(A) but the vice versa is true. Accordingly, the trial court erred in finding Twyman guilty of the more serious offense and in imposing the 180 day sentence. The assignment of error is well taken.
In his fourth assignment, Twyman contends he was denied the effective assistance of counsel because counsel should have pursued an insanity defense.
The United States Supreme Court established a two-pronged analysis by which we may determine whether a defendant's right to a fair trial was denied through the ineffective assistance of his attorney. In Stricklandv. Washington (1984), 466 U.S. 668, the Court stated the defendant must show that counsel's performance fell "below an objective standard of reasonableness," id, at 688, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id, at 694. "Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversarial process that renders the result unreliable." Id. at 687. See State v. Bradley (1989), 42 Ohio St.3d 136,141-42, certiorari denied (1990), 497 U.S. 1011. In considering an ineffective assistance claim, we are also guided by a strong presumption of counsel's competency. State v. Smith (1985), 17 Ohio St.3d 98, 100, citing Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301.
R.C. 29101.01(A) (14) provides that a person is "not guilty by reason of insanity" relative to the charge of an offense only if the person proves that at the time of the offense the person did not know, as a result of a severe mental illness or defect, the wrongfulness of the person's acts.
This record simply will not support a claim that Twyman's counsel was ineffective for not pursuing an insanity defense. Although Twyman's treating physician stated in a letter to the court that Twyman suffers from a mental health disorder resulting in long periods of hospitalization, she did not identify the nature of that disorder, nor express an opinion whether Twyman could have known that his conduct in resisting arrest was wrongful. Also counsel may well have considered that the involuntary commitment that normally follows an insanity acquittal to be worse than probation for a misdemeanor conviction. See, R.C. 2945.40. Counsel may reasonably have believed that it was better to request that the trial court consider the defendant's mental health in obtaining a lenient sentence rather than an outright acquittal. We cannot say on the state of this record that Twyman's counsel's performance fell below an objective standard of reasonableness nor is there a reasonable probability that Twyman would have been acquitted by reason of insanity. The fourth assignment is overruled.
The judgment of the trial court is Affirmed in part, Reversed in part, and as
Reversed, Remanded to the trial court for re-sentencing.
WOLFF, P.J., and YOUNG, J., concur.